M & I First National Bank, West Bend, Wisconsin, as Trustee, Plaintiff-Appellant,

v.

Episcopal Homes Management, Inc., Mary D. Palmer, Robert T. Allen, Earl M. Boulton, Charlotte S. Boulton, Elizabeth A. Brown, Howard G. Brown, Josephine Dietrich, Florence Dietrich, Mary Alice Hammond, Willis R. Hammond, Gordon B. Hoffman, Jessie Hoffman, Eleanor G. Jorgenson, Esther M. Klemp, Ernest Lipman, Samuel Loomis, Mildred G. Macek, Barbara F. Muckler, Dorothy W. Osborne, Irving W. Roane, Ethel V. Roane, Robert Rosenwald, Laura Rosenwald, Marion G. Sanford, Richard C. Thompson, June H. Thompson, Marion Thornbery, Elizabeth Walker, Richard V. Wilkinson, Nancy V. Wilkinson, Helen M. Wilson, James E. Griffiss and Elizabeth H. Miller, Defendants-Respondents,

Elderly Housing Authority, Defendant.

Court of Appeals

*No. 94–1294. Submitted on briefs January 18, 1995.—Decided June 21, 1995.*

(Also reported in 536 N.W.2d 175.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *James O. Huber, Brian W. McGrath*, and *Bryan B. House* of *Foley & Lardner* of Milwaukee.

On behalf of the defendant-respondent, Episcopal Homes Management, Inc., the cause was submitted on the brief of *James W. Hill*, and *JoAnne Breese-Jaeck* of *Hostak, Henzl & Bichler, S.C.* of Racine.

On behalf of the defendants-respondents, Richard V. Wilkinson and Nancy V. Wilkinson, the cause was

submitted on the brief of *Micheal D. Bannon* of *DeMark, Kolbe & Brodek, S.C.* of Racine.

On behalf of individual defendants-respondents, the cause was submitted on the brief of *Wesley R. Mueckler* of *Riegelman & Mueckler, S.C.* of Racine.

Before Brown, Nettesheim and Snyder, JJ.

NETTESHEIM, J.   The subject of this action is a fund in excess of $1,000,000, holding entrance fees paid by the residents of Lake Oaks at DeKoven (DeKoven), a housing facility for the elderly located in the City of Racine and owned by Episcopal Homes Management, Inc. (EHM). The appellant, M&I First National Bank, West Bend, Wisconsin (M&I), is the trustee for approximately 1700 bondholders who hold mortgage revenue bonds which were issued to finance the construction of DeKoven. When EHM defaulted on the mortgage obligation, M&I claimed a priority security interest in the fund and brought this declaratory action to confirm that claim.

At summary judgment, the trial court rejected M&I's claim and, instead, imposed a constructive trust against the fund on behalf of the DeKoven residents. The court held that the specific provisions of the residency agreements governing refunds of the entrance fees prevailed over other provisions in the agreements which subordinated the residents' claims to the status of unsecured creditors in the event of DeKoven's liquidation.

In so ruling, however, the trial court rejected an argument from one set of residents, Richard V. and Nancy V. Wilkinson, that the residency agreements were rental agreements subject to ch. ATCP 134 of the Wisconsin Administrative Code governing "Residential

Rental Practices." The Wilkinsons' situation is unique from the other residents because they are the only residents who have vacated the premises. Upon doing so, they demanded that EHM return their entrance fee. EHM failed to respond. Because the court ruled that the residency agreements were not rental agreements, the court rejected the Wilkinsons' claims for twice the amount of their entrance fee along with their costs and attorney's fees pursuant to § 100.20(5), STATS.

M&I appeals the trial court's imposition of the constructive trust. In a separate and prior appeal, the Wilkinsons have appealed the trial court's rejection of their claim that their residency agreement constituted a rental agreement pursuant to WIS. ADM. CODE § ATCP 134.02(10).[1]

We agree with the Wilkinsons that the residency agreements constitute rental agreements within the meaning of WIS. ADM. CODE § ATCP 134.02(10). On this different ground, we affirm the judgment in this appeal brought by M&I. By separate opinion issued this same day in the Wilkinsons' appeal, we reverse the judgment and remand for entry of judgment in accord with our decision.

### FACTS

In 1989, the Episcopal Diocese of Milwaukee, Inc., in conjunction with the Elderly Housing Authority of Racine, constructed DeKoven, an eighty-five unit eld-

---

[1] In their separate appeal, the Wilkinsons did not name M&I as a respondent. Instead, the Wilkinsons named EHM, the entity with whom the Wilkinsons contracted in their residency agreement. We later granted M&I's request to add it as a respondent in the Wilkinsons' appeal. We then consolidated both appeals for purposes of disposition, but directed that the matters be separately briefed.

erly housing complex located in the City of Racine on property owned by the Diocese. The facility was intended as housing for residents sixty-two years of age and older. To finance the project, the Housing Authority issued $8,260,000 of tax-exempt mortgage revenue bonds and the Diocese issued $3,420,000 of its own taxable bonds. The Diocese received the proceeds derived from the sales of these bonds. M&I was appointed as trustee for the approximately 1700 purchasers of the bonds.

In conjunction with this financing arrangement, the Diocese executed various legal documents, including a "Project Contract" and a promissory note to the Housing Authority. By these documents, the Diocese granted M&I a security interest in: (1) the Housing Authority's right to receive payment from the Diocese on the bond indebtedness; and (2) the Housing Authority's right to all the revenues held by M&I as trustee, including the entrance fees fund. The Diocese also executed trust indentures and a mortgage and security agreement which directly granted to M&I a security interest in "all monthly fees, third party payments, rents, issues, profits, income, revenues and receipts derived in any fashion from [DeKoven]." The Diocese later assigned its rights in the project to EHM, a nonprofit corporation which was created by the Diocese for the purpose of managing DeKoven.

DeKoven was designed for independent living. Each of the residents entered into a standard preprinted form contract with EHM entitled "Residency Agreement." Under the agreement, the residents were entitled to the "sole use and benefit" of their assigned unit and "the use of all common facilities." The residents were entitled to live at DeKoven until they were unable to "live as an independent person as

determined by DeKoven," at which time the residency agreement could be terminated. Although not included in the agreement, DeKoven offered residents planned activities, the use of a swimming pool, a minibus, a community room, garden plots and access to a barber or beautician and a wellness nurse.

The residency agreement required each resident to pay an initial entrance fee as a condition of admission and thereafter pay a monthly fee. The amount of the entrance fee ranged from $19,800 to $77,250, depending on the size of the living unit. Article 15, entitled "Refund of Entrance Fee upon Termination of Residency Agreement," provided for the return of the entrance fee upon termination less the following deductions:

(i) any amounts owed to DeKoven by the Resident, and

(ii) any amounts of the Monthly Fee not paid by the Resident as a result of a dispensation granted in accordance with Article 4 of this Agreement, and

(iii) the reasonable cost of refurbishing the Designated Lake Oaks Residence, and

(iv) the amount of Monthly Fee allocated to the Designated Lake Oaks Residence from the Termination Date to the time a new Resident shall be obligated to pay the Monthly Fee but no longer than nine months from the Termination Date.

Article 12, entitled "Subordination Clause," provided, in relevant part:

[A]ll rights, privileges and benefits thereunder are and shall be at all times subject to and subordinate to the lien of a first mortgage and the accompanying

491

documents executed (or to be executed or assumed) by DeKoven.

Article 16, entitled "Rights of Resident," provided, in relevant part:

> This Agreement is not a lease or easement and Resident is not given exclusive possession of a living unit in the Development as against DeKoven. Pursuant to the requirements of Wisconsin law, DeKoven hereby notifies Residents that if DeKoven were to be liquidated, Resident's claim against the assets of DeKoven would be unsecured. This means that creditors with claims secured by such things as mortgages and liens against real and personal property of DeKoven would be paid before any refunds or other payments could be made to Resident.

DeKoven subsequently experienced financial difficulties and EHM defaulted on the scheduled payments due M&I pursuant to the financing documents. At that time, M&I held approximately $1,000,000 in the entrance fees fund. M&I notified EHM that payment of the entire principal and accrued interest was being accelerated and payment on the entire debt was immediately due.[2] M&I also laid claim to the entrance fees fund pursuant to the various financing documents which either granted M&I a security interest in those funds or documented such interest.

### TRIAL COURT PROCEEDINGS

To confirm its legal right to the entrance fees fund, M&I commenced this declaratory action against EHM,

---

[2] M&I also brought a separate foreclosure action. That action is currently pending and is not before us.

the residents and the Housing Authority.[3] In support, M&I cited to the various financing documents which either created a security interest to M&I in the fund or which recognized such right. M&I contended that it was entitled to apply the entrance fees fund towards the debt owed the bondholders in accord with the bond indentures which specified the disbursement of proceeds in the event of an accelerated debt.[4]

With the exception of the Wilkinsons, the residents filed a single collective answer. They alleged that the provisions of the residency agreements and the bond indentures which specifically addressed the repayment of the entrance fees should take precedence over the subordination provisions upon which M&I was relying.[5] EHM filed an answer echoing this same defense. The Housing Authority filed an answer admitting the allegations in M&I's complaint and did not

---

[3] The action was originally commenced in Washington County. Upon motion by all of the defendants, venue was changed to Racine County.

[4] Because the various financing documents granted M&I a security interest in the entrance fees fund, M&I argued that a prioritization schedule set out in § 804(b) of the tax-exempt indenture and § 7.07 of the taxable indenture governed how the proceeds of the fund were to be disbursed in the event of EHM's default.

[5] The residents cited to § 5.20 of the taxable indenture which referred to the entrance fees and § 514 of the tax-exempt indenture which provided for repayment of the entrance fees pursuant to the residency agreements. The residents also filed a conditional counterclaim against M&I in the event the trial court ruled in favor of M&I. By this counterclaim, the residents alleged that M&I had breached a fiduciary duty owed to them. They asked for damages in the amount of their lost entrance fees plus other relief. The residents' prayer for relief did not expressly ask for a constructive trust.

resist M&I's later motion for summary judgment. As a result, the Housing Authority has not participated in these appellate proceedings.

The Wilkinsons filed a separate answer and counterclaim against M&I and a cross-claim against EHM. The Wilkinsons alleged that the residency agreement with EHM was a lease and that their entrance fee was a security deposit pursuant to ch. ATCP 134 of the Wisconsin Administrative Code.[6] They further alleged that they had previously vacated DeKoven, had demanded a return of their entrance fee and that EHM did not respond to this demand within the time limit set out in the code. Based on this failing, the Wilkinsons sought the relief accorded by § 100.20(5), STATS. They also sought this relief against M&I as the custodian of the entrance fees fund pursuant to the financing agreements.

M&I, EHM and the Wilkinsons all filed motions for summary judgment with supporting affidavits and briefs. M&I argued that the financing documents and the residency agreements established its right, as a matter of law, to a priority security interest in the entrance fees. The Wilkinsons argued, inter alia, that the residency agreement was a lease governed by the law of landlord/tenant and that their entrance fee was a security deposit. EHM argued that the financing documents and the residency agreement established the residents' priority right to the fund; however, it

---

[6] Although the Wilkinsons argue that the residency agreement is a "lease," we note that WIS. ADM. CODE § ATCP 134.02(10) recognizes a lease as a form of rental agreement. Our conclusion that the residency agreement is a rental agreement is sufficient to govern the appellate issues. We need not go further and answer whether the rental agreement additionally qualifies as a lease.

opposed the Wilkinsons' argument that the residency agreement was governed by the law of landlord/tenant. EHM asked the court to impose a constructive trust in favor of the residents.

The remaining residents did not file a motion for summary judgment, but they did file affidavits in opposition to M&I's motion. In these affidavits, the residents contended that when they entered into their respective residency agreements, EHM assured them that their entrance fees were subject only to the deductions set out in Article 15. They further contended that EHM had not advised them that their rights to a refund of the entrance fees were subordinate to the claims of secured creditors in the event of DeKoven's liquidation.[7] The residents argued that M&I was their fiduciary and that M&I's attempt to usurp the entrance fees fund was a violation of that fiduciary duty. Alternatively, the residents joined in the Wilkinsons' argument that the entrance fees constituted security deposits within the meaning of landlord/tenant law and the applicable provisions of the administrative code.

Although the trial court acknowledged that certain aspects of the residency agreement supported the Wilkinsons' argument that the agreement established a landlord/tenant relationship, the court ultimately rejected that interpretation. However, the court did rule in favor of the residents, holding that the specific refund provisions of Article 15 prevailed over the subordination provisions of Articles 12 and 16 which did not specifically reference the entrance fees.[8]

---

[7] The Wilkinsons' affidavits made similar claims.

[8] Our holding in this case does not adopt this reasoning by the trial court. We agree with the trial court that the refund provisions of Article 15 are specific as to the disbursement of the

Having concluded that the subordination provisions of the residency agreement were of no legal effect, the trial court concluded that the Diocese, as EHM's predecessor, could not have granted M&I a security interest in the entrance fees fund of greater proportion than that which it actually owned. Therefore, the court granted summary judgment to the residents even though they had not moved for such relief. *See* § 802.08(6), STATS. The court also imposed a constructive trust against the fund to protect the residents' future interest therein.

M&I appeals. The Wilkinsons separately appeal the trial court's refusal to grant them further relief pursuant to § 100.20(5), STATS. *See also Paulik v. Coombs*, 120 Wis. 2d 431, 433, 355 N.W.2d 357, 358 (Ct. App. 1984).

DISCUSSION

### 1. Standard of Review

We review a motion for summary judgment using the same methodology as the trial court. *See IBM Credit Corp. v. Village of Allouez*, 188 Wis. 2d 143, 149, 524 N.W.2d 132, 134 (1994); § 802.08(2), STATS. That methodology is well known, and we will not repeat it

---

entrance fee upon termination of the residency agreement. However, we disagree with the court that the subordination provisions of Articles 12 and 16 are general provisions. We conclude that these provisions are equally specific to the situations they address: the nature of the residents' rights vis-a-vis the mortgage holder and the status of those rights in the event of DeKoven's liquidation. Our disagreement with the trial court, however, does not change the result since we conclude that the subordination provisions are not enforceable.

here except to observe that summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* § 802.08(2); *see also Grotelueschen v. American Family Mut. Ins. Co.,* 171 Wis. 2d 437, 446, 492 N.W.2d 131, 134 (1992). Although summary judgment presents a question of law which we review de novo, we nonetheless value a trial court's decision on such a question. *Scheunemann v. City of West Bend,* 179 Wis. 2d 469, 475, 507 N.W.2d 163, 165 (Ct. App. 1993). Here, although we disagree with a portion of the trial court's legal conclusions, the court's written decision is thorough and well articulated. It has proven helpful to our appellate review and we will borrow from it in substantial measure.

### 2. *Nature of the Residency Agreement and the Parties' Legal Relationship*

Although the parties' briefs allude to the various financing documents in support of their respective positions, we conclude, as did the trial court, that the solution to the issue presented by this case is necessarily governed by the terms of the residency agreements between the residents and EHM. We say this because the residents were not privy to any of the financing negotiations and dealings between the Diocese, the Housing Authority, EHM and M&I. Nor were the residents parties to any of the financing agreements between those entities resulting from those dealings. It is axiomatic that if the residency agreement created a priority interest in the entrance fees fund to the residents, EHM had no authority to bargain away that right in its dealings with M&I or any other third party.

497

Therefore, we focus our inquiry on the residency agreement in order to determine the nature of that agreement, the legal relationship which the parties formed and their resulting rights and responsibilities. This requires that we construe the agreement. Like summary judgment, this also presents a question of law which we review independently of the trial court's decision. *Heritage Mut. Ins. Co. v. Truck Ins. Exch.*, 184 Wis. 2d 247, 252, 516 N.W.2d 8, 9 (Ct. App. 1994). Although we have already given an overview of the residency agreement, we now analyze its salient provisions in greater detail.

Each agreement was presented to the prospective resident in a standard preprinted form. The document is entitled "Residency Agreement." The introductory paragraphs recited the motives of each party in choosing to enter into the agreement:

> WHEREAS DeKoven has developed a retirement housing project primarily for persons of the age of 62 years and older known as Lake Oaks at DeKoven and located at 1916 Wisconsin Avenue, Racine, Wisconsin; and
> WHEREAS Resident desires to occupy the Designated Lake Oaks Residence . . . .

In the next paragraph, the agreement recited the consideration running to each party:

> NOW, THEREFORE, in consideration of One Dollar ($1.00) paid to each of the Parties by the other party, the receipt of which is hereby acknowledged, and in further consideration of the mutual promises contained herein, DeKoven hereby grants to Resident the right to enter into this Residency Agreement and to reside in the Development at the Designated Lake Oaks Residence as long as Resi-

dent is able to live independently unless this Agreement is terminated as provided herein.

Article 1 of the agreement obligated the resident to pay an entrance fee. This payment established the resident's right to reside at DeKoven and to receive "certain additional services described herein."[9]

Article 2 of the agreement obligated the resident to pay "a monthly fee . . . equal to one-twelfth . . . of the amount allocated to Resident's share of the sum required by DeKoven to meet annual expenses pertaining to the Development and to the property or facilities which the Resident is entitled to utilize in the Development."[10] The summary judgment record reveals that these monthly fees ranged from $780 to $1717 per month. The Wilkinsons paid $1100 per month. These monthly payments were due on the first day of each month. The agreement also provided for dispensation of the monthly fee in special circumstances when a resident was unable to pay.

Article 10 of the agreement entitled the resident to reside at DeKoven so long as he or she was able to live independently. DeKoven had the sole right to make this determination. If DeKoven determined that a resident could no longer live independently, it could terminate the residency agreement. If such occurred, the resident was entitled to a refund of the entrance fee pursuant to the provisions of Article 15, subject to deductions for: (1) any amount owed to DeKoven by the

---

[9] The services recited in the residency agreement included various utilities, garbage and trash collection, repair and maintenance of the property and the use of all common facilities.

[10] Generally, these annual expenses covered costs related to operations, management, taxes, service charges, assessments, insurance utilities, reserve accounts, repairs, maintenance and mortgage payments.

resident; (2) monthly fees not paid due to prior dispensation; (3) reasonable costs of refurbishing the dwelling unit; and (4) the amount of monthly fees lost while locating a new resident, not to exceed nine months.

Article 14 of the agreement recited other grounds for termination by DeKoven. These included the resident's mental or emotional disturbance if such was detrimental to the health, safety or welfare of the resident or other residents, failure to comply with the rules of the development, or failure or refusal to pay the monthly fees. This article also allowed the resident to terminate the agreement upon notice. Whether the termination was at the instance of DeKoven or the resident, this article provided for the refund of the entrance fee pursuant to Article 15.

Finally, as we have previously noted, Article 12 subordinated the residents' rights to the first mortgage, and Article 16 recited that the residents' claims would be unsecured in the event of DeKoven's liquidation.

We first address the nature of the legal relationship which EHM and the residents created by their contract. We recognize that most contracts are unique to the parties and their special circumstances, needs and wishes. We also recognize that before we may conclude that the parties contracted as landlord and tenant, there must be a showing of circumstances which permits the inference that the parties intended to assume that relationship. *See Town of Menominee v. Skubitz*, 53 Wis. 2d 430, 435-36, 192 N.W.2d 887, 889 (1972).

We are well satisfied from a common sense reading of the residency agreement viewed in its entirety that EHM and the residents entered into a rental agreement and that the parties contracted as landlord and

tenants respectively. Reduced to its essence, the agreement made DeKoven's living units available to the residents for purposes of the residents' housing needs in exchange for financial remuneration, i.e., rent. "Rent" is defined as "Consideration paid for use or occupation of property." BLACK'S LAW DICTIONARY 1297 (6th ed. 1990). We see nothing in the agreement itself, or elsewhere in the summary judgment record, which demonstrates that the *primary and dominant* purpose of the agreement was otherwise; nor do we see any evidence which reveals that EHM and the residents entered into this contractual arrangement in legal capacities other than as landlord and tenants.

Our conclusion is not altered by the fact that DeKoven is a housing facility tailored to the needs of the elderly, providing certain amenities to such persons. Many residential rental complexes provide services and facilities which lure a particular kind of resident. Absent evidence which shows that the provision of such amenities is the primary purpose of the parties' contract, the parties' relationship is one of landlord/tenant and their contract (written or oral) is one which exchanges housing for rent.

M&I argues that the residency agreement does not establish a landlord/tenant relationship because the agreement expressly says at Article 16, "This Agreement is not a lease . . . ." However, the labels which parties use in their agreements are not always controlling. *See Younger v. Rosenow Paper & Supply Co.*, 51 Wis. 2d 619, 630, 188 N.W.2d 507, 513 (1971). Moreover, M&I's argument risks placing form over substance by ignoring the predominant theme of other provisions in the agreement. Such an approach also risks an unreasonable interpretation and a "hybrid result" because it impairs a consideration of the agree-

ment in its entirety, making "fish out of one paragraph, fowl out of the next." *Schwartz v. Evangelical Deaconess Soc'y*, 46 Wis. 2d 432, 440, 175 N.W.2d 225, 229 (1970). While we must be careful to not import more than what the parties agreed, *see Goossen v. Estate of Standaert*, 189 Wis. 2d 237, 246-47, 525 N.W.2d 314, 318 (Ct. App. 1994), we also must be careful to not alter the true nature of the parties' contract and the legal relationship which they created by their agreement.

Although this agreement may have other unrelated ambiguities, its thrust on this critical and threshold point is inescapable—the agreement provides the residents with housing in exchange for their entrance fees and monthly payments. That arrangement is nothing more or less than a classic rental agreement. Saying it is not so does not change the legal realities or consequences of the agreement.

Our conclusion is bolstered by the relevant subsections of WIS. ADM. CODE § ATCP 134.02. Subsection (10) defines "Rental agreement" as:

> [A]ny agreement, whether written or oral, for the rental or lease of a dwelling unit or premises, and includes contracts or rules and regulations which are incidental to, or adopted pursuant to a rental agreement.

Here, the residency agreement was clearly a written agreement for the rental of a DeKoven living unit.

Subsection (2) defines "Dwelling unit" as:

> [A] structure or that part of a structure that is primarily used as a home, residence, or place of abode.

Here, the residency agreement clearly grants a resident the right to use the unit as a residence.

Subsection (5) defines "Landlord" as:

> [T]he owner or lessor of a dwelling unit under any rental agreement, and any agent acting on the owner's or lessor's behalf.

Here, EHM was acting in a landlord capacity.

Subsection (12) of the same section defines "Tenant" as:

> [A] person occupying, or entitled to present or future occupancy of a dwelling unit under a rental agreement.

Here, each resident was acting in a tenant capacity.

M&I argues, however, that WIS. ADM. CODE § ATCP 134.01(1), exempts DeKoven from the administrative code. This section reads:

> This chapter . . . applies to the rental of dwelling units located in this state. It does not apply to the rental or occupancy of dwelling units:
> **(1)** Operated by an institution, public or private, if incidental to detention *or the provision of medical, geriatric, educational, counseling, religious or similar services.* [Emphasis added.]

M&I contends that DeKoven is operated for the "provision of . . . geriatric [and] religious services" within the meaning of WIS. ADM. CODE § ATCP 134.01(1). However, we have already concluded, based on our construction of the residency agreement, that the agreement's fundamental goal was housing in exchange for rent. Nonetheless, we address this specific argument by M&I.

M&I bases this argument on three factors: (1) DeKoven was intended for elderly persons; (2) it was financed, in part, under the auspices of a housing authority for elderly persons pursuant to § 66.395, STATS.; and (3) it has strong religious ties.

However, M&I's argument is flawed because the exemption set out in WIS. ADM. CODE § ATCP 134.01(1) applies only if the rental is *incidental* to the provision of geriatric or religious services. "Incidental" means "[d]epending upon or appertaining to something else as primary; . . . something incidental to the main purpose." BLACK'S LAW DICTIONARY 762 (6th ed. 1990); *Home Mut. Ins. Co. v. Insurance Co. of N. Am.,* 20 Wis. 2d 48, 54, 121 N.W.2d 275, 278 (1963).

The summary judgment record in this case does not reveal any evidence which expressly shows or reasonably implies that DeKoven's *dominant and main purpose* was to provide such geriatric services. To the contrary, as we have already demonstrated, DeKoven's dominant and primary purpose was to provide housing. Although DeKoven provided a wellness nurse and other amenities catering to the needs and enjoyment of elderly persons,[11] DeKoven was not marketed as a nursing home or life-care facility designed to provide geriatric services. "Geriatrics" is defined as "the branch of medicine dealing with the physiology of aging and the diagnosis and treatment of diseases affecting the aged." MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 667 (4th ed. 1994). The summary judgment record raises no material issue of fact on this question.

We also reject M&I's further argument that DeKoven's primary function is religious. Although DeKoven has well-established religious roots, affiliation with the Episcopal Church was not a condition of residency. And again, even if it were, we could not say pursuant to WIS. ADM. CODE § ATCP 134.01(1) that DeKoven's primary purpose was to provide religious

---

[11] We note that while the evidentiary record refers to these services, the residency agreement says nothing about them.

services and that residency was only incidental thereto.

Finally, M&I argues that if facilities such as DeKoven are not exempt from WIS. ADM. CODE ch. ATCP 134, Wisconsin's life-care communities will be jeopardized. M&I, however, assumes that DeKoven was a life-care facility. While we readily accept the premise that the parties hoped the residents could live out their days at DeKoven, the agreement itself envisioned at Article 10 a likely scenario (given the natural consequences of aging) under which a resident could be forced out of DeKoven because of a deteriorating health condition. The concept of "life care" to an elderly person connotes more than mere shelter and incidental amenities. Article 10, by its very terms, cuts against M&I's "life-care" argument since that provision envisions EHM evicting a resident who can no longer live independently. An elderly person seeking "life care" would not look to a facility such as DeKoven in the face of such a contractual provision. Again, we observe that DeKoven was neither a nursing home nor a continuing care facility. *See, e.g.,* ch. 647, STATS. Instead, DeKoven provided housing to a congenial group of people sixty-two years of age and older.[12]

---

[12] In its brief, EHM states that "[e]ntrance fees are common to elder care facilities" and cites to numerous cases where substantial entrance fees have remained the property of the facility. *See In re Independence Village, Inc.*, 52 B.R. 715, 724 (Bankr. E.D. Mich. 1985) (elderly residents promised "lifetime care in return for a substantial endowment upon entrance"); *Bower v. Estaugh,* 369 A.2d 20, 21 (N.J. Super. Ct. App. Div. 1977) (elderly residents paid entrance fee to enter life-care contract whereby they received medical services, meals, laundry and housekeeping services); *Guthmann v. La Vida Llena,* 709 P.2d 675, 677, 681 (N.M. 1985) (residence agreement and

We hold as a matter of law that the parties contracted in a landlord/tenant capacity. We also hold as a matter of law that the parties' residency agreements constituted "[r]ental agreement[s]" within the meaning of WIS. ADM. CODE § ATCP 134.02(10). The summary judgment record presents no material issues of fact on these questions.

### 3. The Legal Function of the Entrance Fees

Having established the legal relationship of the contracting parties and the legal nature of their agreement, we now turn to the question of whether M&I is entitled to its claimed priority security interest in the entrance fees fund as against the interests of the residents.

Here again, we properly look to the residency agreement. However, unlike the preceding issue, we are not limited to only that document. Where the public policy of this state is expressed in acts of the legislature, those provisions step in and control and regulate the mutual rights and obligations of the parties to a contract relating to the subject matter of the statute. *Goossen*, 189 Wis. 2d at 248, 525 N.W.2d at 319; *Gordie Boucher Lincoln-Mercury Madison, Inc. v. J & H Landfill, Inc.*, 172 Wis. 2d 333, 340, 493 N.W.2d 375, 378 (Ct.

entrance fee entitled resident to private unit "for the rest of her life" and guaranteed admittance into the nursing care center whenever required, and policy of no-refund of entrance fee after death used as part of comprehensive financing plan). However, as we have already explained, unlike the institutions in the cases EHM cites, DeKoven did not offer its residents life-care contracts, *see* ch. 647, STATS., nor did it otherwise provide geriatric services, *see* WIS. ADM. CODE § ATCP 134.01(1). Accordingly, we find these cases unpersuasive to the issue in this case.

App. 1992). Administrative rules may express funda-
mental and important public policy, and they have the
full force and effect of legislative enactments. *Winkel-
man v. Beloit Memorial Hosp.,* 168 Wis. 2d 12, 22-23,
483 N.W.2d 211, 215 (1992). Since we have concluded
that EHM and the residents contracted in a land-
lord/tenant relationship and forged a rental
agreement, we must apply the relevant provisions of
the administrative code to that agreement.

WISCONSIN ADM. CODE § ATCP 134.02(11) defines
"[s]ecurity deposit" as follows:

> "Security deposit" means the total of all payments
> and deposits given by a tenant to the landlord as
> security for the performance of the tenant's obliga-
> tions, and includes all rent payments in excess of 1
> month's prepaid rent.

Landlords commonly require tenants to make
deposits to secure the tenants' performance of contrac-
tual obligations so as to avoid the costs and risks
associated with seeking judicial relief. *See* ROBERT S.
SCHOSHINSKI, AMERICAN LAW OF LANDLORD AND TENANT
§ 6.27, at 450 (1980). The classification of a deposit is
based on the intent of the parties as manifested by
their contractual language; however, what the parties
name the nature and function of the deposit is not
always controlling. *See id.* at 451.

Deposits by tenants may stand to serve various
purposes. A landlord may demand a deposit of a stated
amount of money from a tenant as security for the
performance of the tenant's contractual obligations to
the landlord. RESTATEMENT (SECOND) OF PROPERTY § 12.1
cmt. 1 (1976). The construction of a deposit as a security
deposit accommodates both the landlord's desire for
protection and the tenant's normal expectation for the

return of all or part of the fund at the end of the tenancy. SCHOSHINSKI, *supra,* § 6.27, at 451-52. However, a deposit by a tenant can serve as an advance payment of rent. *See Mountain Queen Condominium Ass'n, v. Haan,* 753 P.2d 1234, 1235, 1239 (Colo. 1988) (payment of full amount due for four days at ski resort constituted advance performance of renter's obligation to pay rent). A deposit might also be a bonus or consideration for the execution of a lease. *See Schulman v. Vera,* 166 Cal. Rptr. 620, 627 (Ct. App. 1980) (primary purpose of an amount payable by the tenant "upon execution of this instrument" with no provision for its return was to secure execution of the lease).

In this case, Article 1 of the residency agreement makes but one express reference to the purpose of the entrance fee. It provides: "Payment of the Entrance Fee establishes the rights of the Resident to reside in the Development and to certain additional services described herein." From this, M&I reasons that the entrance fee established nothing more than the resident's right to take up residency.

We have no quarrel with that reasoning as far as it goes. However, the same can be said of all security deposits. If a rental agreement requires a security deposit as a condition of residency, it does not necessarily follow that such is the only purpose of the deposit. M&I's argument overlooks other relevant provisions of the residency agreement. Thus, we do not limit our consideration to Article 1. We properly look to other provisions of the agreement in order to determine whether the entrance fee deposit served any further intended function. *See Campion v. Montgomery Elevator Co.,* 172 Wis. 2d 405, 416, 493 N.W.2d 244, 249 (Ct. App. 1992).

The answer to this inquiry lies in Article 15 governing the refund of the entrance fee upon termination of the residency agreement. As we have noted, the residency agreement obligated the resident to pay a monthly fee unless DeKoven dispensed with that requirement. However, pursuant to Article 15, upon termination, the resident was required to pay DeKoven: (1) any moneys due and owing, including monthly fees previously dispensed; (2) the reasonable cost of refurbishing the dwelling unit; and (3) the monthly fees lost by DeKoven until a new resident occupied the unit, not to exceed nine months.

It is thus clear that pursuant to Article 15, DeKoven was entitled to look to a resident's entrance fee as security for the resident's performance of these obligations. This is precisely what WIS. ADM. CODE § ATCP 134.02(11) envisions as a "[s]ecurity deposit." "[T]he total of all payments and deposits given by a tenant to the landlord as security for the performance of the tenant's obligations . . . ." *Id.*[13]

We acknowledge that the security deposits in this case are substantial. However, Wisconsin law places no

---

[13] Thus, we reject M&I's further argument that this case is akin to *Mountain Queen Condominium Ass'n v. Haan,* 753 P.2d 1234, 1238-39 (Colo. 1988), where the Colorado Supreme Court held that an advance sum required by a ski resort to confirm a reservation was not a security deposit to secure the performance of a rental agreement, but rather an advance rental payment made to confirm a reservation. The Colorado law defined "security deposit" as "any advance or deposit of money, regardless of its denomination, the primary function of which is to secure the performance of a rental agreement for residential premises or any part thereof." *Id.* at 1237. As we have explained, the terms of the residency agreement in this case did much more than merely confirm the resident's right to take up residency.

dollar limit on the amount of a security deposit.[14] *See id.*

Moreover, when we look to the potential obligations of a DeKoven resident upon termination, the amount of the security deposit becomes less daunting. The monthly fees paid by the residents were also substantial ($780 to $1717 per month). Upon termination, the resident was responsible to DeKoven for any delinquent monthly fees, whether previously dispensed or not. Therefore, since the residency agreement contained no specified term, the amount of a delinquency could cover an extended period of time. In addition, the resident was potentially responsible for an added nine months of monthly fees, plus the reasonable costs of refurbishing the dwelling unit. Therefore, despite the substantial security deposit, the charges against the deposit could also be substantial. In a given case, the amount owed DeKoven could consume all, or a great portion of, the entrance fee.

---

[14] *Contra* UNIF. RESIDENTIAL LANDLORD AND TENANT ACT § 2.101(a) ("A landlord may not demand or receive security, however denominated, in an amount or value in excess of [1] month[s] periodic rent."). This act has not been adopted in Wisconsin.

The limitation on the amount a landlord may demand as a security deposit varies from jurisdiction to jurisdiction. *See, e.g.,* ALASKA STAT. § 34.03.070 (two months' rent except where the rent exceeds $2000 per month); MICH. COMP. LAWS § 554.602 (one and one-half months' rent); N.C. GEN. STAT. § 42-51 (two weeks' rent for week-to-week tenancy, one and one-half months' rent for month-to-month tenancy, two months' rent for tenancies greater than month to month). *See generally* ROBERT S. SCHOSHINSKI, AMERICAN LAW OF LANDLORD AND TENANT § 6.41 (1980) (discussion of statutory restrictions on the amount and use of tenant deposits).

Next, we must determine the effect, if any, of the subordination provisions in Articles 12 and 16 on the entrance fees. Again, these provisions recited, respectively, that the resident's rights under the agreement were subordinate to the first mortgage lien and that the resident's claims against DeKoven would be unsecured in the event of DeKoven's liquidation.

However, WIS. ADM. CODE § ATCP 134.06(3), entitled "Limitations on security deposit withholding," provides, in part, at para. (a):

> Except for other reasons clearly agreed upon in writing at the time the rental agreement is entered into, *other than in a form provision*, security deposits may be withheld only for tenant damage, waste or neglect of the premises, or the nonpayment of: [rent, certain utility services and certain mobile home parking fees]. [Emphasis added.]

WISCONSIN ADM. CODE § ATCP 134.02(4) defines "Form provision" as:

> [A] written rule, regulation, or rental or contract provision that has not been specifically and separately negotiated and agreed to by the tenant in writing. *Any provision appearing as part of a preprinted form is rebuttably presumed to be a form provision.* [Emphasis added.]

The trial court's written decision variously described the residency agreement as a "standard printed form" and a "preprinted form contract." This characterization is not challenged on appeal, and our independent review of the evidentiary record confirms the court's description. Beyond that, the record also shows no evidence which rebuts the presumption that

511

the residency agreements were form provisions. Thus, because the subordination provisions were part of the standard form provisions in the residency agreement, they are of no legal effect. *See Moonlight v. Boyce*, 125 Wis. 2d 298, 304, 372 N.W.2d 479, 483 (Ct. App. 1985).[15]

### 4. Constructive Trust

Last, M&I argues that the trial court erred by imposing a constructive trust on the entrance fees fund. Specifically, M&I contends that the elements justifying a constructive trust are not present in this case.

A constructive trust is an equitable device utilized to prevent unjust enrichment. *Wilharms v. Wilharms*, 93 Wis. 2d 671, 678, 287 N.W.2d 779, 783 (1980). One seeking a constructive trust must establish the elements of unjust enrichment and also that the benefit to the other party was obtained or retained by means of actual or constructive fraud, duress, abuse of a confidential relationship, mistake, commission of a wrong or other unconscionable conduct. *Id.* at 678-79, 287 N.W.2d at 783. A constructive trust, being equitable in nature, may be used in a variety of situations, sometimes to develop a new field of equitable interposition.

---

[15] M&I also argues that the residents subordinated their interests in the entrance fees pursuant to § 409.316, STATS., which provides: "**Priority subject to subordination.** Nothing in this chapter [U.C.C.—Secured Transactions] prevents subordination by agreement by any person entitled to priority." Our decision does no violence to § 409.316. That provision merely recognizes that a priority interest can be subordinated. However, WIS. ADM. CODE § ATCP 134.06(3) teaches how that subordination can be legally accomplished in a rental agreement.

*Krueger v. Rodenberg,* 190 Wis. 2d 368, 378, 527 N.W.2d 381, 386 (Ct. App. 1994). Whether to impose a constructive trust is addressed to the trial court's discretion. *Singer v. Jones,* 173 Wis. 2d 191, 194-96, 496 N.W.2d 156, 158 (Ct. App. 1992).

Contract provisions which violate public policy are unconscionable. *See Discount Fabric House, Inc. v. Wisconsin Tel. Co.,* 117 Wis. 2d 587, 604, 345 N.W.2d 417, 426 (1984); *see also Smith Realty Co. v. Zimmerman,* 75 Wis. 2d 11, 17, 248 N.W.2d 472, 475 (1977). Where a person holding property transfers it to another in violation of a duty owed to a third person, the third person can reach the property in the hands of the transferee by a constructive trust unless the transferee is a bona fide purchaser. *Wilharms,* 93 Wis. 2d at 679, 287 N.W.2d at 783. However, mere ignorance of the recipient of the original impropriety does not make the recipient an innocent or bona fide purchaser. *Richards v. Richards,* 58 Wis. 2d 290, 298, 206 N.W.2d 134, 138 (1973).

We have already held that the subordination provisions of the residency agreement are in violation of the declared public policy of this state as set out in the administrative code. As such, they are unconscionable and are unenforceable against the residents.

The enforcement of those provisions against the residents would obviously unjustly enrich M&I as trustee on behalf of the bondholders. As the trial court observed, the summary judgment record establishes that M&I operated with knowledge of the residency agreements, since the financing documents expressly alluded to them. M&I's right to the entrance fees is properly measured by EHM's threshold right to them under the residency agreements. As we have explained, that right is limited by the refund provisions of Article 15, not the subordination provisions of Arti-

513

cles 12 and 16. As such, M&I knowingly holds a benefit conferred by the residents, under circumstances in which such retention would be inequitable. This satisfies the elements of unjust enrichment. *See Watts v. Watts*, 137 Wis. 2d 506, 531, 405 N.W.2d 303, 313 (1987).

We conclude that the trial court properly exercised its discretion by imposing a constructive trust against the fund to assure the proper disbursement of the fees.

## CONCLUSION

We hold that: (1) the residents and EHM contracted as landlord and tenant, (2) their contracts were rental agreements within the meaning of the law, (3) the entrance fees were security deposits within the meaning of the law, (4) the trial court properly rejected M&I's claim for a priority security interest in the entrance fees fund, and (5) the court did not misuse its discretion in imposing a constructive trust against the fund for the protection of the residents.

*By the Court.*—Judgment affirmed.