Bruce L. OTTINGER, a minor, by his guardian ad litem, Michael J. Jassak and Arlene A. Ottinger, Plaintiffs-Appellants,

v.

Sergeant Jose PINEL and Sergeant Robert LaRose, Defendants-Respondents,

Christopher J. MELIK and Kenosha County Department of Social Services, Defendants.

Court of Appeals

*No. 96–3403. Submitted on briefs September 12, 1997.—Decided November 26, 1997.*

(Also reported in 572 N.W.2d 519.)

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Michael J. Jassak* and *Steven T. Botzau* of *Habush, Habush, Davis & Rottier, S.C.* of Racine.

On behalf of the defendants-respondents, the cause was submitted on the brief of *James E. Doyle,* attorney general, and *Michael J. Losse,* assistant attorney general.

Before Snyder, P.J., Nettesheim and Anderson, JJ.

ANDERSON, J. Bruce L. Ottinger, by his guardian ad litem, Michael T. Jassak, and his mother Arlene A. Ottinger (Ottinger) appeal from a summary judgment dismissing his claim of negligence based on the doctrine of public immunity in favor of Sergeants Jose Pinel and Robert LaRose (the Guards). We conclude that the doctrine of public officer immunity precludes this negligence action against the Guards. Our decision is also directed by considerations of public policy. We affirm the judgment.

## FACTS

Initially, we note that the doctrine of public immunity assumes that the public officer was negligent. Therefore, the question before us is whether the Guards are entitled to immunity. *See Kimps v. Hill,* 187 Wis. 2d 508, 514, 523 N.W.2d 281, 285 (Ct. App. 1994), *aff'd,* 200 Wis. 2d 1, 546 N.W.2d 151 (1996). The following facts are relevant to that issue.

In December 1992, Bruce was attempting to cross Sheridan Road in Kenosha county when he was struck by a state-owned van operated by Christopher J. Melik. Melik was attempting to escape from the Kenosha Correctional Center (the facility), a minimum security correctional facility. The Guards work for the Wisconsin Department of Corrections as correctional officers at the facility and were on duty when Melik escaped.

271

Bruce suffered serious injuries as a result of the accident.

A few hours before Melik's attempted escape from the facility, he was observed by Pinel at Regency Mall in Racine. Melik was a prisoner on work release and his presence at the mall was a violation of the conditions of his work release from the facility. At the time, Pinel was off duty from his job at the facility; however, he called the facility for guidance. The superintendent determined that the facility would wait until Melik returned from work release to confront him about his alleged work release violation.

When he arrived at the facility, the Guards asked Melik to enter the temporary lock-up room. Instead, Melik fled the building and commandeered a state-owned van. It was while escaping in this van that Melik struck Bruce.

Consequently, Bruce's mother and his guardian ad litem brought this action against the Guards alleging that they were negligent in allowing Melik to escape. The Guards denied responsibility for the accident and moved for summary judgment. The Guards' motion was granted. Ottinger appeals.

STANDARD OF REVIEW

We review a motion for summary judgment using the same methodology as the trial court. *See M & I First Nat'l Bank v. Episcopal Homes Management, Inc.*, 195 Wis. 2d 485, 496, 536 N.W.2d 175, 182 (Ct. App. 1995). That methodology is well known, and we will not repeat it here except to observe that summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See id.* at 496–97, 536 N.W.2d

at 182. Summary judgment presents a question of law which we review de novo. *See id.* at 497, 536 N.W.2d at 182. As the material facts are conceded by the Guards, only issues of law remain to be determined.

Ottinger maintains that the Guards should not be afforded immunity under the facts of this case. Public employees are immune from personal liability for injuries resulting from the negligent performance of a discretionary act within the scope of their public office. *See Santiago v. Ware*, 205 Wis. 2d 295, 338, 556 N.W.2d 356, 373 (Ct. App. 1996), *cert.* denied, 117 S. Ct. 2435 (1997). However, the shield of immunity may be stripped away if: (1) the employee engages in malicious, willful or intentional conduct, (2) the employee negligently performs a ministerial duty or (3) the employee is aware of a danger that is of such quality that the public officer's duty to act becomes absolute, certain and imperative. *See Barillari v. City of Milwaukee*, 194 Wis. 2d 247, 257–58, 533 N.W.2d 759, 763 (1995). Ottinger contends that exceptions two (ministerial duty) and three (known danger) are applicable.

Ottinger first argues that the Guards breached their ministerial duty to prevent an escape. According to Ottinger, the following demonstrates the Guards' breach: (1) when Melik left work release to go to the mall, he was an escapee and the Guards had a ministerial duty to apprehend him at the mall or at work; (2) failure to handcuff Melik while in the lock-up room; (3) failure to secure the lock-up room; and (4) failure to stop him as he ran out of the lock-up room and out the front door. Ottinger cites to several administrative

■

rules to establish the Guards' breach of their ministerial duty.[1]

A ministerial duty can be embodied in statutes, administrative rules, policies or orders. *See Kimps*, 187 Wis. 2d at 515, 523 N.W.2d at 285. In order for a public officer's duty to be ministerial, it must be "absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance . . . [such] that nothing remains for judgment or discretion." *Lister v. Board of Regents,* 72 Wis. 2d 282, 301, 240 N.W.2d 610, 622 (1976). A discretionary and therefore immune act, on the other hand, is one

---

[1] Ottinger relies on WIS. ADM. CODE §§ DOC 303.22, 303.51 and 306.12(k) and (p) in support of this contention. Section DOC 303.22(1)(d) defines escape as: "An inmate who . . . [l]eaves the authorized area to which he or she is assigned and does not return promptly." Similarly, § DOC 303.51 provides: "Any inmate . . . who leaves the immediate area of a work or school assignment before the . . . assignment is over is guilty of an offense [of leaving an assigned area], unless . . . [t]he inmate gets permission . . . or [t]he inmate has a valid pass . . . ." Lastly, § DOC 306.12(1) requires each institution to have a written plan in case of an escape. The plan must include "[n]otification of law enforcement officials of the escape" and "[p]ursuit of the escapee." Section DOC 306.12(k) and (p). These rules neither describe nor require "clear and absolute" action by the Guards. In fact, guards were "advised to exercise their judgment in choosing the time, manner, and mode of confrontation" of inmates who may have committed rule violations. A discretionary act, not a ministerial act, involves choice or judgment. *See Santiago v. Ware*, 205 Wis. 2d 295, 338, 556 N.W.2d 356, 373 (Ct. App. 1996), *cert. denied*, 117 S. Ct. 2435 (1997). Because these sections require discretionary enforcement, we do not view them as controlling.

that involves choice or judgment. *See Santiago*, 205 Wis. 2d at 338, 556 N.W.2d at 373. There is no substantive liability for damages resulting from mistakes in judgment where the officer is specifically empowered to exercise such judgment. *See Lister*, 72 Wis. 2d at 301–02, 240 N.W.2d at 622.

A duty was placed on the Guards to prevent the escape of any inmate. *See* WIS. ADM. CODE § DOC 306.11. However, the Department of Corrections Securities Policies and Procedures Manual more clearly outlines the procedures for escape and apprehension. The manual provides in part:

F. When inmates escape from minimum security facilities, staff have the dual responsibility to give proper notification to authorities and to attempt to apprehend the escapee. *Dependent upon the circumstances such as:*

 1. How long the inmate has been gone;

 2. Did you observe the inmate run toward the door;

 3. *The available staff to pursue and apprehend and yet have staff stay and safely supervise the remaining inmates.*

G. Pursuit of inmates should be coordinated with law enforcement. Normally the County Sheriff's Department will take the key role. Staff from minimum security facilities are *not* authorized to carry or use firearms.

 . . . .

J. Staff are to make *every reasonable* effort to apprehend inmates attempting to escape.

. . . .

M. If an inmate escapes there is a duty to notify and also to apprehend if possible, however *it is of paramount importance that other inmates at the facility are properly accounted for and supervised so other inmates don't get escape fever.* [Emphasis added.]

These procedures for correction officers are written in discretionary terms. None are absolute, certain and imperative, involving merely the performance of a specific task prescribed by the law such that nothing remains for judgment or discretion. Despite the general duty to prevent an escape, correctional officers are given wide latitude in determining how to handle an escape, how much force, if permitted, is necessary to prevent an escape and at what point to stop the pursuit. Not only do the guards have a duty to prevent and/or pursue an escapee, they have a specific and competing duty to maintain order in the facility by supervising the remaining, nonescaping inmates. Such duties require quick judgment by the guards on the appropriate action to take and, therefore, are not ministerial.

Next, Ottinger argues that the "known and present danger exception also applies to the facts of this case." Ottinger posits that the Guards failed to respond to a present danger when they permitted Melik to walk past them out of the building and escape from the facility. Ottinger asks that the guards be found liable for their refusal to make any effort to prevent the escape of a known, dangerous inmate.

A public officer may face liability when he or she is aware of a danger that is of such distinction that the public officer's duty to act becomes "absolute, certain and imperative." *See Lister,* 72 Wis. 2d at 301, 240 N.W.2d at 622. The leading case on this exception is *Cords v. Anderson,* 80 Wis. 2d 525, 259 N.W.2d 672 (1977). In *Cords,* the court held that the immunity defense was not available to a state park manager who failed to notify superiors of a hazardous ninety-foot drop along a trail or erect signs to warn park patrons of the trail's dangerous condition. *See Cords,* 80 Wis. 2d at 541, 259 N.W.2d at 679–80. In that case, the manager knew of the danger, had the authority to act, and failed to act. *See id.; Barillari,* 194 Wis. 2d at 258, 533 N.W.2d at 763.

This case is distinguishable. Unlike the known and present danger in *Cords,* there is nothing about the facility here that would put the Guards on a heightened state of alert. The facility is a minimum security work release center; all of the inmates housed there are on their way to parole and many of them are on work release. We conclude that this particular facility did not present a known or imminent danger that meets the *Cords* exception.

Although there is evidence that Melik had "dangerous propensities"—based on his record—there is no evidence that the Guards *were aware* of Melik's record such that he constituted a "known and present danger." Correctional officers are not to examine the criminal records of inmates so that each inmate enters the facility "with a 'clean slate.'" Both Guards testified that they were unaware of Melik's criminal record and that he was not a disciplinary problem while incarcer-

ated at the facility. In addition, only those inmates whose behavior indicates that they are essentially non-threatening are permitted to participate in the work release program. Melik was selected as an appropriate participant in the work release program. It is apparent that the Guards had no knowledge or indication that Melik was a "known and present danger." We conclude that the *Cords* exception does not apply.

### PUBLIC POLICY

Ottinger's final contention is that public policy necessitates a finding of liability in this case. Ottinger claims that recent federal and state decisions support the imposition of liability for public officers and employees "when states create a dangerous situation or render its citizens more vulnerable to danger." .

■■■

We first note that the supreme court has warned against using the analyses that courts of other jurisdictions have used in public officer immunity cases. The court commented:

> Because we are satisfied that the questions presented in the case at bar are resolved by well-established Wisconsin law regarding the doctrine of immunity, we find that examination of decisions from other jurisdictions regarding immunity is unnecessary. Moreover, we find, as did the court of appeals, that the analysis applied in other jurisdictions regarding immunity is unhelpful.

*C.L. v. Olson*, 143 Wis. 2d 701, 718 n.10, 422 N.W.2d 614, 620 (1988). We are bound by decisions of the supreme court. *See Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246, 256 (1997).

278

Ottinger's reliance on *Losinski v. County of Trempealeau*, 946 F.2d 544 (7th Cir. 1991), is misplaced as well. Decisions of the Seventh Circuit are not precedent when a state appellate court is applying state law to facts. *See Johnson v. County of Crawford*, 195 Wis. 2d 374, 383, 536 N.W.2d 167, 170 (Ct. App. 1995).

In addition, *Losinski* is factually distinguishable. In *Losinski*, the Seventh Circuit considered the known and compelling danger exception to immunity when it looked at "alleged failure of a deputy sheriff to protect a domestic violence victim from her husband, who shot and killed her in the deputy's presence." *Losinski*, 946 F.2d at 546. The court concluded that the deputy had assumed the duty to protect the victim from her husband (he was aware of the restraining order and the husband's violent tendencies) and that this duty to protect her diminished any discretion the deputy may have had. *See id.* at 554.

The situation faced by the Guards in this case is quite different. First, there is no evidence that the Guards undertook a duty to protect Bruce, or anyone else for that matter, from Melik. And we are unwilling to hold that the State and its correctional officers have assumed the duty to protect the general public from injury inflicted by escaping inmates. Although correctional officials have a duty to make every reasonable effort to apprehend inmates attempting to escape, they have an equally important duty to account for, supervise and maintain order of the remaining inmates at the facility too. The nature of operating a penal institution, including the management of inmates and prevention of escapes, requires "moment-to-moment decisions and crisis management" which requires that

correctional officers have discretion on how they will deal with any situation that arises. *Cf. Barillari*, 194 Wis. 2d at 260, 533 N.W.2d at 764 ("[L]aw enforcement requires moment-to-moment decision making and crisis management which, in turn, requires that the police department have the latitude to decide how best to utilize law enforcement resources."). To hold otherwise would essentially defeat the purpose of public officer immunity.

The immunity afforded public officers in the performance of their official duties is a common law concept. *See Lister*, 72 Wis. 2d at 299, 240 N.W.2d at 621. The public policy reasons behind the immunity are:

> (1) The danger of influencing public officers in the performance of their functions by the threat of lawsuit; (2) the deterrent effect which the threat of personal liability might have on those who are considering entering public service; (3) the drain on valuable time caused by such actions; (4) the unfairness of subjecting officials to personal liability for the acts of their subordinates; and (5) the feeling that the ballot and removal procedures are more appropriate methods of dealing with misconduct in public office.

*Id.* We conclude that these reasons for immunity of public officers are equally applicable in this case and transcend the public policy reasons advanced by Ottinger to pierce the immunity shield.

*By the Court.*—Judgment affirmed.