**2021 WI App 62**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.: 2020AP1329

Complete Title of Case:

**KIMESHA WILLIAMS,**

  **PLAINTIFF-APPELLANT,**

  **V.**

**DISTRICT COUNCIL OF MADISON INC.,**

  **DEFENDANT-RESPONDENT.**

| | |
|---|---|
| Opinion Filed: | July 29, 2021 |
| Oral Argument: | March 29, 2021 |
| JUDGES: | Blanchard, Kloppenburg, and Graham, JJ. |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Erica K. Lopez* and *Heidi M. Wegleitner* of *Legal Action of Wisconsin, Inc.*, Madison.  There was oral argument by *Erica K. Lopez.* |
| Respondent ATTORNEYS: | On behalf of the defendant-respondent, the cause was submitted on the brief and oral argument of *Anthony R. Varda* of *DeWitt LLP*, Madison. |

# COURT OF APPEALS
## DECISION
## DATED AND FILED

### July 29, 2021

Sheila T. Reiff
Clerk of Court of Appeals

### NOTICE

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

---

Appeal No. **2020AP1329**

**STATE OF WISCONSIN**

Cir. Ct. No. **2019CV1986**

**IN COURT OF APPEALS**

---

KIMESHA WILLIAMS,

   PLAINTIFF-APPELLANT,

V.

DISTRICT COUNCIL OF MADISON INC.,

   DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Dane County: RHONDA L. LANFORD, Judge. *Affirmed*.

Before Blanchard, Kloppenburg, and Graham, JJ.

¶1      BLANCHARD, J.  The District Council of Madison, Inc., Society of St. Vincent de Paul ("the Society") and Kimesha Williams entered into a contract.  Under the contract, the Society permitted Williams to occupy a unit in a residential facility owned and managed by the Society.  The parties also agreed

that Williams would participate in a program that the Society ran, which was aimed at helping women without ready access to stable housing find better housing situations in the future. The program called for Society staff to educate, counsel, and otherwise assist Williams within the facility's controlled environment. Five months after Williams moved into the unit, the Society terminated her from the program and required her to vacate the unit she occupied.

¶2 In this action, Williams claims that, under Wisconsin landlord-tenant laws, the Society and Williams had a landlord-tenant relationship. According to Williams, when the Society removed her from the unit it violated laws regarding the eviction procedures that apply to landlords. The Society moved for summary judgment and Williams moved for partial summary judgment. The Society did not contest that it did not follow the judicial eviction procedures in the landlord-tenant laws. But it argued that it did not have to follow the procedures, because the legal relationship here was that of a program manager and a program participant, not of a landlord and a tenant. The circuit court agreed with the Society, and as a result granted summary judgment in its favor, denied Williams's partial motion for summary judgment, and dismissed the complaint. Williams appeals.

¶3 We affirm summary judgment for the Society and denial of partial summary for Williams based on the analytical approach used in *M & I First National Bank v. Episcopal Homes Management, Inc.*, 195 Wis. 2d 485, 536 N.W.2d 175 (Ct. App. 1995), which interprets WIS. ADMIN. CODE ch. ATCP 134 (through June 2021).[1] Under this approach, we consider the terms of the contract

---

[1] All references to the Wisconsin Administrative Code ch. ATCP 134 are to the June 2021 Register except where otherwise noted.

along with other relevant evidence to determine whether the primary and dominant purpose of the legal relationship between the Society and Williams was to provide Williams with temporary housing (in which case the parties entered into a rental agreement) or was instead to make available to Williams educational, counseling, and similar services (in which case they did not enter into a rental agreement). We conclude that the primary and dominant purpose was to make available to Williams educational, counseling, and similar services that would help her obtain more stable housing in the future and that Williams's temporary occupation of the unit was only incidental to that purpose. Accordingly, we affirm summary judgment.

## BACKGROUND

¶4      At all relevant times, the Society operated the St. Elizabeth Ann Seton Transitional Housing Program in a facility in Madison.[2] Williams was homeless when the Society's program director and Williams signed a contract. We address details of the contract in the Discussion section below, and the following is sufficient as background. Williams agreed to participate in the program "on a day-to-day basis," to pay a monthly "program fee," and to follow rules creating a controlled environment. These rules included prohibitions on male guests and alcohol consumption, and a requirement to allow program staff to enter any unit, including hers, at any time without notice and also to allow searches of her unit. The Society agreed to allow Williams and her two dependent

---

[2] For ease of reference, we collectively refer to the Society and its Seton House facility and program as "the Society."

children to reside in an assigned unit, but on the condition that the family had to vacate "upon notification of program termination."

¶5      The family moved into a two-bedroom, furnished unit assigned to them under the contract. They resided in the unit for approximately five months, before the program director informed Williams that she was being terminated from the program based on alleged violations of the contract and as a result of program termination her family had to move out.

¶6      Citing landlord-tenant law, Williams promptly initiated this action and moved for a temporary restraining order. The proposed order would prevent the Society "from engaging in non-judicial or self-help eviction" of Williams, "or otherwise from denying Williams access to" what she described as "her rental unit" in the Society's facility. The basis of her legal claim was that the Society violated landlord-tenant law, namely, WIS. STAT. ch. 704 (2019-20) and WIS. ADMIN. CODE ch. ATCP 134, not that the Society had violated a contract term.[3] Under ch. 704, landlords must follow the eviction procedures in WIS. STAT ch. 799, through judicial process. *See* WIS. STAT. § 704.44(2m) (rental agreement void if it allows eviction outside statutory procedures). Chapter ATCP 134 defines unfair business practices in this context. *See* WIS. STAT. § 100.20(2)(a); WIS. ADMIN. CODE ch. ATCP 134 (note) (Wisconsin Department of Agriculture, Trade and Consumer Protection promulgates ch. ATCP 134 under authority of § 100.20(2), which authorizes the department to "issue general orders forbidding

---

[3] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

4

methods of competition in business or trade practices in business which are determined by the department to be unfair.").

¶7     The Society did not dispute that, in removing Williams from the unit, it did not pursue a small claims case for eviction or take other steps required of landlords in WIS. STAT. ch. 704 and WIS. ADMIN. CODE ch. ATCP 134. Its position was that it did not have to follow those procedures because the parties had not established a landlord-tenant relationship.

¶8     The circuit court issued an emergency ex parte order and promptly scheduled an evidentiary hearing, at which both sides appeared by counsel, in order to resolve Williams's request for injunctive relief.[4] The court heard witness testimony and admitted into evidence exhibits that included the contract. Based on this evidence, and relying on the reasoning in *M & I*, the court vacated the emergency order and denied Williams's motion for a temporary injunction.

¶9     Williams filed an amended complaint, seeking injunctive, declaratory, and monetary relief.[5] Relying largely on the evidence presented at the evidentiary hearing on the injunction motion, the Society moved for summary judgment on all of Williams's claims, arguing that there was not a landlord-tenant

---

[4] The Honorable John Hyland issued the emergency order. The Honorable Rhonda L. Lanford presided over the evidentiary hearing and made the decisions at issue in this appeal.

[5] In the amended complaint, Williams specifically claimed that the Society: (1) violated WIS. ADMIN. CODE § ATCP 134.09(7), which prohibits landlords from conducting "self-help evictions"; (2) violated WIS. STAT. § 704.44(2m) and WIS. ADMIN. CODE § ATCP 134.08(2), which render void any rental agreement if a landlord evicts a tenant other than through judicial eviction procedures; and (3) was liable for common law trespass, based on the Society taking possession of the unit "without lawfully terminating her tenancy" in a manner consistent with various provisions in ch. 704.

relationship to which either WIS. STAT. ch. 704 or WIS. ADMIN. CODE ch. 134 apply, given the nature of the contract and the program that Williams signed up for. Williams opposed this motion and moved for partial summary judgment in her favor on her trespass claim, emphasizing that the contract required her to make monthly payments and assigned her family a particular unit in which to reside. Relying on the same reasoning that it had applied in denying Williams's motion for an injunction, the circuit court granted summary judgment in favor of the Society, denied Williams's motion for partial summary judgment, and dismissed the complaint. Williams appeals.

## DISCUSSION

¶10     We review de novo the circuit court's decisions on the motions for summary judgment, applying the same methodology that circuit courts apply. *See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2). A factual dispute is genuine if a reasonable jury could return a verdict in favor of the nonmoving party and the dispute is material if it could affect the outcome of the trial under the applicable legal standards. *Schmidt v. Northern States Power Co.*, 2007 WI 136, ¶24, 305 Wis. 2d 538, 742 N.W.2d 294. "[I]f more than one reasonable inference can be drawn from the undisputed facts, summary judgment is not appropriate." *Id.*, ¶47.

¶11     *M & I* is central to our analysis. For that reason, we begin by summarizing it. Then we explain how the reasoning in *M & I* applies to the

undisputed evidence here, supporting the Society's position, and address contrary arguments by Williams.

### I.    *M & I*

¶12    The contract at issue in *M & I*, called a "residency agreement," contained provisions addressing potential refunds to residents of entrance fees that they had to pay upon admission.  *M & I*, 195 Wis. 2d at 488, 491.  After the facility owner defaulted on a mortgage, a creditor brought a declaratory action claiming a priority interest in accumulated entrance fees.  *Id.* at 488, 492-93.  The residents relied on provisions in the contract that they argued gave them priority interests in the fees.  *Id.* at 493.  This brought to the fore the following question: Was the contract subject to WIS. ADMIN. CODE ch. ATCP 134?  *M & I*, 195 Wis. 2d at 488-89, 494, 497, 500.  If so, administrative code provisions might require the facility-as-landlord to return "security deposits" to the residents-as-tenants.  *Id.* at 506-07.

¶13    The creditor argued that the contract was not a "rental agreement" under WIS. ADMIN. CODE § ATCP 134.02(10).[6]  *See M & I*, 195 Wis. 2d at 489,

---

[6]  *M & I First National Bank v. Episcopal Homes Management, Inc.*, 195 Wis. 2d 485, 536 N.W.2d 175 (Ct. App. 1995), relies in part on a prior version of WIS. ADMIN. CODE ch. ATCP 134 that for the most part uses language that has been retained in the current version. However, although the parties make no note of it, there have been revisions to the wording of some provisions.  *Compare* ch. ATCP 134 (June 2021) *with* ch. ATCP 134 (Apr. 1993), (https://docs.legis.wisconsin.gov/code/register/1993/448b/insert/atcp134.pdf).    We    note differences in provisions that we reference.  The version of § ATCP 134.02(10) at the time of *M & I* stated:

> "Rental agreement" means any agreement, whether written or oral, for the rental or lease of a dwelling unit or premises, and includes contracts or rules and regulations which are incidental to, or adopted pursuant to a rental agreement.

(continued)

494-95. This argument was based in part on the fact that the contract stated in part: "'This Agreement is not a lease or easement and Resident is not given exclusive possession of a living unit'" in the facility. *See id.* at 492, 501.

¶14 Relying in large part on undisputed evidence that the facility was "neither a nursing home nor a continuing care facility," but instead provided "housing" to a "group of people sixty-two years of age and older," we concluded in pertinent part that the residents and the facility owner "contracted in a landlord/tenant capacity" when they entered into the contracts. *Id.* at 505-06. From this conclusion it followed that the contract "constituted [a] 'rental agreement' within the meaning of WIS. ADMIN. CODE § ATCP 134.02(10)." *M & I*, 195 Wis. 2d at 506.

¶15 We now highlight one feature of *M & I*. The court closely considered the specific terms of the contract, largely anchoring its analysis in the terms of the contract and to what the court referred to as the "thrust" of the contract. *See id.* at 498-502. Yet the court did not base its decision entirely on the contract's terms. The court explained that it needed to be "careful to not alter the

---

Sec. ATCP 134.02(10) (Apr. 1993). The current version states:

> "Rental agreement" means an oral or written agreement between a landlord and tenant, for the rental or lease of a specific dwelling unit or premises, in which the landlord and tenant agree on the essential terms of the tenancy, such as rent. "Rental agreement" includes a lease. "Rental agreement" does not include an agreement to enter into a rental agreement in the future.

Sec. ATCP 134.02(10) (June 2021). While there are differences between the definitions that perhaps could matter in other contexts, we discern no difference that could matter to the interpretations in *M & I* that we apply in this appeal.

true nature of the parties' contract and the legal relationship which they created by their agreement," which the court indicated calls for consideration of all relevant undisputed evidence, not only what was stated in the contract. *See id.* at 501-02, 504 & n.11 (discussing what the summary judgment record revealed and taking note of facts found in the "evidentiary record" that were not referred to in the contract). Thus, we learn from *M & I* that, in the context of deciding whether landlord-tenant law applies to the relationship between an owner of property and its occupier, courts are to scrutinize both the terms of any contracts they entered into and also evidence bearing on the nature of their "legal relationship." *See id.* at 498-506.[7] In short, the surrounding circumstances must be considered along with the intentions of the parties as expressed in the contract.

¶16     On a related point, the *M & I* court rejected an argument that the contract could not be deemed a rental agreement under landlord-tenant law because it provided in part that it "is not a lease or easement" and that residents were "not given exclusive possession of a living unit." *Id.* at 492, 501-02. The court relied on a general rule of contract interpretation, which is that "the labels which parties use in their agreements are not always controlling," but instead a contract must be considered "in its entirety." *Id.* It would put "form over

---

[7] The court in *M & I* makes one reference to its analysis being "limited" to considering "only" the contract in determining whether the parties entered into a landlord-tenant relationship. *See M & I*, 195 Wis. 2d at 506. However, we interpret the opinion as a whole to convey that the court considered itself limited to considering only the contract *along with* evidence of the surrounding circumstances bearing on the nature of the legal relationship of the parties.

substance" to apply this particular provision in a mechanical fashion and "ignor[e] the predominant theme of other provisions in the agreement." *Id.* at 501.[8]

¶17    Proceeding in our discussion of other aspects of *M & I*, we indicated that a court seeking to determine whether a relationship is that of landlord and tenant must take into account "the legal realities or consequences of the agreement" between property owner and property occupier to determine whether these render the particular "arrangement" "more or less than a classic rental agreement." *Id.* at 502.[9]    In that case, "[r]educed to its essence, the agreement made [the facility's] living units available to the residents for purposes of the

---

[8] Without explicitly saying so, in looking beyond the terms of the contract to surrounding circumstances the *M & I* court may have also implicitly relied on the following rule of contract interpretation.  Although courts are to treat contract language as the expression of the parties' intent (here, whether or not the parties intended to treat their relationship as one of landlord and tenant), when contract language is susceptible to more than one reasonable interpretation, a court may look beyond the language and consider extrinsic evidence to determine the parties' mutual intent. *See Town Bank v. City Real Estate Dev., LLC*, 2010 WI 134, ¶33, 330 Wis. 2d 340, 793 N.W.2d 476.  The notion would be that, read as whole, the contract in *M & I* was ambiguous on the issue of whether the parties intended it to be a rental agreement under Wisconsin law, despite the fact that it stated at one point that it was "not a lease or easement" and that residents were "not given exclusive possession of a living unit." *See M & I*, 195 Wis. 2d at 492.

[9] The court in *M & I* does not define "classic rental agreement."  We question how there could be any independent analytical value in speaking in terms of what a given court might consider to be "classic" or "not classic" in this context.  Most adults, including judges, have seen a number of rental agreements for property, and those experiences tend to create impressions about what might be a standard provision.  We recognize the temptation to visualize "standard, traditional rental agreements." *See, e.g.*, *Kohler v. Snow Village, Inc.*, 475 N.E.2d 1298, 1302 (Ohio App. 1984) (relying on this concept in discussing whether a cooperative apartment occupancy agreement was a "rental agreement" under Ohio law).  However, we do not discern any independent solving power in attempting to characterize contract provisions or surrounding circumstances as falling inside or outside notions of what might seem to be classic, standard, or traditional.  Nor do we discern any basis in Wisconsin law to make such an attempt.  Rather, we interpret this "classic rental agreement" reference in *M & I* to be in the nature of a summing up—applying a label of "classic" only after the court had reached its conclusion based on the substantive considerations that we discuss in the text.

residents' housing needs in exchange for financial remuneration, i.e., rent." *Id.* at 501. The court further explained that it could not discern anything

> in the agreement itself, or elsewhere in the summary judgment record, which demonstrates that the *primary and dominant* purpose of the agreement was otherwise; nor do we see any evidence which reveals that [the facility owner] and the residents entered into this contractual arrangement in legal capacities other than as landlord and tenants.

*Id.* (emphasis in original). The result did not change merely because the facility provided services "tailored to the needs of the elderly," such as the availability of a "wellness nurse," because "the primary purpose of the parties' contract" remained housing in exchange for rent and not geriatric services in exchange for payments. *Id.* at 491, 501, 504. The court stated:

> Many residential rental complexes provide services and facilities which lure a particular kind of resident. Absent evidence which shows that the provision of such amenities is the primary purpose of the parties' contract, the parties' relationship is one of landlord/tenant and their contract (written or oral) is one which exchanges housing for rent.

*Id.* at 501.

¶18    In discussing the contents of the contract, the court spoke of the "purpose of the agreement" based on its expressed terms, not based on the subjective purposes of any resident or any facility manager. *See id.* This is consistent with the rule of contract interpretation that "'a literal meeting of the minds is not required for an enforceable contract,'" *see Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 179, 557 N.W.2d 67 (1996) (quoted source omitted), but instead courts rely on an objective standard to determine the nature of a contract, *see id.* at 181.

¶19     In turning to the administrative code, the court concluded that its decision about the "legal realities" and "consequences" of the contract was "bolstered by" provisions in WIS. ADMIN. CODE ch. ATCP 134.[10]   **M & I**, 195 Wis. 2d at 502.   Addressing WIS. ADMIN. CODE § ATCP 134.02(10), which provided that a "[r]ental agreement" is a written or oral agreement "'for the rental or lease of a dwelling unit or premises,'" the **M & I** court had no difficulty in concluding that "the residency agreement was clearly a written agreement for the rental of a … living unit." **M & I**, 195 Wis. 2d at 502.[11]   Similarly, the court concluded that the contract "clearly grants a resident the right to use the unit as a residence" consistent with § ATCP 134.02(2), which defined a "[d]welling unit" in pertinent part as a "structure or that part of a structure that is primarily used as a home, residence, or place of abode." **M & I**, 195 Wis. 2d at 502.[12]

¶20     In the same vein, the court considered it obvious that the facility owner met the definition of "landlord" in WIS. ADMIN. CODE § ATCP 134.02(5) and that the residents met the definition of "tenant" in § ATCP 134.02(12), which

---

[10] The court in **M & I** did not cite any provision in WIS. STAT. ch. 704.  As the Society points out, there is no definition of "landlord" or "tenant" in ch. 704 and its definitions of "lease," "premises," "rental agreement," and "tenancy" provide limited guidance for current purposes. *See* WIS. STAT. § 704.01(1), (3), (3m), and (4).

Williams at one point in her briefing asserts that "[c]ommon law defines" the terms "landlord" and "tenant" "extensively," but she fails to provide a supported argument based on any common law precedent.  As explained in the text, we rely on **M & I**'s "primary and dominant purpose" test, which is rooted in the administrative code.

[11] *See* WIS. ADMIN. CODE § ATCP 134.02(10) (Apr. 1993).  As stated *supra* at note 6, § ATCP 134.02(10) has not been revised in any way that is pertinent here since the time **M & I** was decided.

[12] There is no difference that matters here between the terms of WIS. ADMIN. CODE § ATCP 134.02(2) (Apr. 1993) and § ATCP 134.02(2) (June 2021).

are definitions that have not changed since the time of *M & I*.[13] *See M & I*, 195 Wis. 2d at 502-03. These definitions continue to turn on what a "rental agreement" is determined to be, because a "landlord" is the "owner or lessor of a dwelling unit under any rental agreement, and any agent acting on the owner's or lessor's behalf," § ATCP 134.02(5), and a "tenant" is a "person occupying, or entitled to present or future occupancy of a dwelling unit under a rental agreement," § ATCP 134.02(12).

¶21    The court rejected an argument that the facility owner was exempt from landlord status under WIS. ADMIN. CODE § ATCP 134.01(1). *M & I*, 195 Wis. 2d at 503-04. Section ATCP 134.01(1) establishes that not all places where occupants reside by agreement with property owners are "dwelling units." It provides that ch. ATCP 134 "applies to the rental of dwelling units located in this state, but does not apply to the rental or occupancy of" a "dwelling unit operated by a public or private institution if occupancy is incidental to detention or the provision of medical, geriatric, educational, counseling, religious or similar services."[14]    *See* § ATCP 134.01(1); *M & I*, 195 Wis. 2d at 503. The court determined that the facility's furnishing of lodging to the residents was not merely "incidental" to the facility's provision of geriatric and religious services. *M & I*, 195 Wis. 2d at 504. Regarding geriatric services, the court considered it significant that the facility "was not marketed as a nursing home or life-care

---

[13] *Compare* WIS. ADMIN. CODE § ATCP 134.02(5) (Apr. 1993) *with* § ATCP 134.02(5) (June 2021) and *compare* § ATCP 134.02(12) (Apr. 1993) *with* § ATCP 134.02(12) (June 2021).

[14] There have been insignificant wording changes to WIS. ADMIN. CODE § ATCP 134.01(1) since the time of *M & I*. *Compare* § ATCP 134.01(1) (Apr. 1993) *with* § ATCP 134.01(1) (June 2021).

facility designed to provide geriatric services." *See id.* Regarding religious services, the court noted that "affiliation with the Episcopal Church was not a condition of residency," and that "even if it were," the evidence was that residency was the facility's "primary purpose," not religious services. *Id.* at 504-05.

## II. Analysis

¶22 Following the approach in *M & I*, we first summarize salient features of the contract here and then summarize the relevant, undisputed evidence outside the four corners of the contract bearing on the nature of the legal relationship between the Society and Williams. We then apply the reasoning in *M & I* to the undisputed evidence.

### A. The Terms Of The Contract

¶23 The following are notable features of the 21-paragraph contract between the Society and Williams.

- The "goal" of the program is "to provide homeless women and children temporary shelter and case management to help families move from homelessness to permanent housing."

- The contract describes itself as a "transitional housing contract," which it states was "different than a landlord/tenant lease," and it also states that "**Seton House is not bound by the usual landlord/tenant laws nor required to go through the eviction process of the usual landlord/tenant relationship**" (bolding in original).

- Williams and her children are assigned to occupy an identified residential unit in a building owned and managed by the Society.

- Williams has to pay a "[p]rogram fee" of $425 a month on the first day of each month.

- Williams's participation in the program is to be "on a day-to-day basis" and she is obligated to "vacate the premise[s] upon notification of [p]rogram termination."

- "No male guests are allowed in the units or on the premises at any time."

- Program staff "may enter the units and common areas at any time without notice."

- Program staff have "the right" "to conduct searches of" residential units, apparently without limitation as to lack of notice or as to timing or scope of search.

- "[T]he Program Director has the right to make, enforce, add to, or revise Program rules as necessary."

- A Society program description document that the parties agree is incorporated into the contract states that the "[l]ength of program stay will vary depending on individual situations, with a maximum stay of two years."

¶24    Of special note is the following four-part paragraph in the contract, now quoted in its entirety, which we refer to as the "required-participation provision":

> The Participant understands that her participation in the Program is on a day-to-day basis. She agrees to work with the Program Director to establish individualized goals for securing permanent housing and related issues. Participation in the Program may be terminated if she fails to actively work on her goals as outlined in her case plan.
>
> a. Each participant is required to keep a true and accurate daily record of income and expenses and provide documentation of same. Each participant is also required to make up a monthly budget and to follow it.
>
> b. The Program Director can advocate for the Participant. That advocacy is often facilitated by signing Releases of Information so that the Program Director can communicate with other agencies. The Participant understands that refusing to sign or cancelling a Release of

15

> Information may negatively impact the ability to provide services.
>
> c. It is expected that individuals will be up and working on program activities by no later than 8:30AM. It is expected that you will be in your unit and quiet by 10:00PM. If you are going to be out past 10:00PM or away overnight you must contact the Program Director.

## B. Undisputed Evidence Regarding Surrounding Circumstances

¶25 Williams's testimony included the following.[15] While Williams was riding around on the bus with her two children, because they had nowhere else to go, she spotted a sign in a window of the Society's facility announcing what Williams then realized, or soon learned, was a program involving "transitional housing that's only for women with children and single women." When Williams applied, the program director "went over the rules" with her, informing her "what the program was about," including that program staff would help her "with permanent housing and sign [her] up for different housing agencies like [the City of Madison Economic Development Division], Section 8, and things like that."

---

[15] We follow the lead of the parties in treating testimony and exhibits from the evidentiary hearing on Williams's request for injunctive relief as part of the summary judgment materials. Explaining this choice, in the parties' summary judgment briefing in the circuit court both sides relied on exhibits admitted at the evidentiary hearing, and the Society consistently relied on testimony given at the hearing in seeking summary judgment, without objection by Williams either in the circuit court or now on appeal. Further, Williams in her briefing on appeal now cites to the transcript of the evidentiary hearing, and she does not argue that the summary judgment materials do not include, for example, a video offered by the Society to illustrate a program "success story" and admitted at the hearing, on which the Society partly relies in making its appellate argument.

On a related note, we assume without deciding that an affidavit that Williams submitted in the circuit court does not need to be disregarded under the "sham affidavit" rule. Further, in resolving Williams's challenges to summary judgment decisions by the circuit court we do not rely on explicit or implicit credibility determinations made by the court regarding testimony given at the evidentiary hearing.

Williams had two purposes in applying: to obtain temporary housing in the Society facility and to avail herself of program services, knowing that there would be "case management" involved.

¶26 Williams was given keys to her assigned unit, which she described as "like a normal apartment," with "two bedrooms, a bathroom, kitchen[,] a nice-sized kitchen, living room, and downstairs is the washer and dryer." When Williams moved in, the program provided her with household items, such as diapers, wipes, and cleaning materials, and then program staff continued to provide these supplies throughout her stay. They also provided her with "gift cards" with which she could purchase food, helped her reestablish a card that allowed her to participate in the FoodShare Wisconsin program when it expired, and gave her vouchers for food and clothing purchases.

¶27 Williams further testified that the program director informed her from the outset that she needed to meet with the director once a week, which they proceeded to do when she lived there. At these meetings, Williams would talk with the program director about "whatever, anything"—such as about "my week, about the kids"—and Williams would provide the program director with receipts for items she had purchased, such as groceries. The meetings tended to center around financial budgeting issues and "getting me to permanent housing." Williams was not required to attend classes or to pursue licensing of any type, but program staff helped her to learn to manage money and assisted her with numerous applications for more stable housing. Williams would also use these weekly meetings to pay her monthly program fees when she was able to, but there were no late fees if she was not able to timely pay, and program staff worked with her to accept monthly fees as she was able to pay them.

¶28 An exhibit offered by the Society and admitted at the evidentiary hearing, without objection by Williams, reflects weekly case plan reports, which were each signed by both Williams and a program director. The following are representative report notations: "Financial: worked overtime yesterday[;] will get paid on Tuesday"; "Housing: CDA housing forms due 17th"; "Director Activities: need[s] pampers"; "Housing: Keep it clean. Call me if you need help."; "Housing: All good. Looking awesome!"; "Financial: Paid program fee. Owes sister $450 for program fee. Worked M-F 10-5."

¶29 In her testimony, Williams praised the first program director as "amazing," testifying that the director

> helped me with everything. She was on top of her business when it came to the housing applications and responding to us, …. Her relationship with my kids was awesome, they loved her…. I talked to her about anything and everything, my problems and situations.

The second program director on one occasion took Williams and her children to a barbershop so that the children could have haircuts and then to a food pantry for food.

¶30 Williams testified that one evening in July 2019, the second program director informed Williams that she would have to vacate the unit. This "devastated" Williams because she had "nowhere else to go." The next day the program director informed her by letter that the program director had "decided to terminate [Williams] from the program due to [Williams] not following the program agreement," and that Williams "must exit the unit" within three days. The letter specified alleged violations, which Williams disputed, but these disputes are not pertinent to the arguments of the parties on appeal. The program director allowed Williams to remain in the unit longer than the initially set three-day limit,

first due to unusually hot weather and area power outages and then pursuant to the restraining order issued in this case.

¶31 The second program manager testified in part as follows. The purpose of the program was

> to provide a safe and nurturing environment for residents and program participants to be able to live independently and successfully after the program's completion. It's to help people who are vulnerable…. A lot of them are either domestic violence survivors or they are suffering from alcohol and drug issues. They most likely are homeless, and we're working on getting them the ability to be successful in the community.

Regarding the various rules that control the facility environment, the second program manager testified that these were "crucial," because "stability and safety in one's surroundings" are necessary for women in the program "to feel safe and secure in their environment." As for case management services, she testified that this partly involved helping the women budget their money, address debt repayment, and improve their credit scores. There could also be a financial "crisis management" component, which she testified she helped Williams with.

¶32 Society executive Ernest Stetenfeld testified in part that program fees paid by participants did not cover even program costs, much less could they have supported facility-related expenses. Instead, facility-related expenses were covered through targeted donations, other fundraising efforts, non-governmental grants, and net revenues of the Society, "derived in part from the sales of donated goods."

## C.     Application Of *M & I*

¶33    Williams does not make the specific argument that there are facts in dispute that must be resolved by a jury.  Instead, she argues that the circuit court erred based on misinterpretations of the law in granting summary judgment to the Society and in denying partial summary judgment to her.  On our de novo review, we determine that summary judgment in favor of the Society was based on correct interpretations of the law.

¶34    Based on the terms of the contract and the undisputed surrounding circumstances, we conclude that the Society and Williams did not enter into the contract in the capacities of landlord and tenant, and that the contract did not constitute a rental agreement for rental of a dwelling unit within the meaning of WIS. ADMIN. CODE ch. ATCP 134.  This is because the primary and dominant purpose of the parties was to make available to Williams the educational, counseling, and similar services that would help her obtain more stable housing in the future, and her temporary occupancy of the facility was merely incidental to that purpose.  *See* WIS. ADMIN. CODE § ATCP 134.01(1) (excluding from "the rental of dwelling units" circumstances in which "occupancy is incidental to … the provision of … educational, counseling, … or similar services.").[16]  The temporary

---

[16] At oral argument counsel for the Society acknowledged that the Society could not base an argument on the phrase "the provision of … religious … services" in WIS. ADMIN. CODE § ATCP 134.01(1) because the Society did not select program participants for, nor did it encourage them to form or hold, religious beliefs.  *See M & I*, 195 Wis. 2d at 504-05.

On a related topic, without attempting to provide a categorical definition of the phrase "or similar services" in WIS. ADMIN. CODE § ATCP 134.01(1) that might apply in other contexts, we construe this phrase to include at a minimum the specific types of tutoring, monitoring, guidance, and advising that the undisputed evidence shows the Society made available to Williams here.  At oral argument counsel for the Society spoke in terms of "life coaching" in "the skills that will

(continued)

housing component was only an incidental part of the relationship, and therefore the contract was not a rental agreement. Unlike in *M & I*, in which the court saw "nothing" that demonstrated a primary and dominant purpose other than to create a rental agreement and no evidence revealing a relationship other than that of landlord and tenant, *see M & I*, 195 Wis. 2d at 501, here the contract and the undisputed evidence regarding the surrounding circumstances establish a primarily programmatic purpose.[17] We now review in turn the contract and the undisputed evidence regarding surrounding circumstances.

### 1. Application To The Terms Of The Contract

¶35 We begin by noting multiple, related aspects of the contract which indicate that its primary and dominant purpose is to help women without ready access to stable housing learn how to find and retain better housing situations, and which undermine Williams's argument that "access to programming is just a bonus" to the temporary housing that she submits is the program's primary and dominant purpose.

¶36 First, the contract contains statements that are, at least in themselves, explicit in stating that it is not intended to be a rental agreement and that the Society disavows the applicability of the landlord-tenant laws. Further, the

---

allow for independent living in general," and this appears to aptly convey the sort of services reflected in the undisputed evidence.

[17] The Society may intend to make a categorical argument that we would reject. The Society asserts, "Charitable transitional housing programs do not involve a landlord[-]tenant relationship." If intended as a standalone argument, this would be contrary to the approach taken in *M & I*, which requires courts to assess the specifics of any contract and the surrounding circumstances on a case-by-case basis. Labels such as "charitable housing program" are not dispositive. *See M & I*, 195 Wis. 2d at 501.

contract contains no statements that could be interpreted in themselves to state the opposite. As we have observed, our analysis is not necessarily controlled by the presence or absence of any such statements. *See M & I*, 195 Wis. 2d at 501-02 ("labels" that "parties use in their agreements are *not always* controlling" (emphasis added)). However, the Society can reasonably rely on the clarity of these statements as providing support for its position that the landlord-tenant laws do not apply here. Williams signed a contract that plainly conveyed the idea that she was entering a program aimed at helping her obtain more stable housing in the future that provided incidental, transitional housing, and that she was not entering into a rental agreement with incidental education, counseling, and similar services.

¶37    Second, the required-participation provision, quoted *supra* at ¶24, is especially notable. There are no doubt elements in the contract that, when considered in isolation, weigh in favor of rental agreement status. However, the parties agreed in the required-participation provision that Williams was signing up for a program requiring her to generally give up her right to be left alone and was taking on regular, intrusive obligations in order to limit distractions from, and maximize her chances for, the goal of obtaining and retaining more stable housing in the future for as long as she was a program participant. For example, this provision includes a curfew-like feature, which establishes that it is a program violation for a participant to be absent from a unit on any night after 10:00 p.m. without notice to program staff, with the apparent purpose of limiting distractions for her and for other program participants.

¶38    Third, magnifying the import of the required-participation provision, a range of other provisions committed Williams to an intrusive and restricting set of obligations in order to maximize chances of finding housing security, such as requiring her to permit entry of program staff to her unit at any time and taking

22

from her the usual rights of tenants such as allowing male visitors and consuming alcohol. The evident goal of these fairly severe limitations on her autonomy was, as the Society argues, to help "[p]rogram participants to take control of their lives so that they can be self-supporting and live independently," without distractions. Putting together some of the rules in the contract, Williams agreed to participate in the program on a daily basis, including keeping a detailed account of her finances and allowing staff access to her assigned unit at any time, as part of a program with rules that can change whenever program staff consider a rule change to be necessary—all with the understanding that she has to vacate her assigned unit whenever she is notified that she has been terminated from the program.[18] A reasonable construction of the combination of significant obligations and limitations on Williams's rights was that they had the evident purpose of maximizing the effectiveness of education, counseling, and similar services and to minimize distractions. That is, the parties agreed that Williams would give up a large measure of her autonomy in exchange for services to help her obtain more stable housing, and the Society would take on the extensive responsibilities of managing the program and having direct, routine interactions with Williams to educate, counsel, and otherwise support her attempts to obtain more stable housing.[19]

---

[18] Particularly striking is this provision: "The Participant also acknowledges the right of [program staff] to conduct searches of" "the units and common areas," apparently at any time, without notice. This provision conveys an especially strong programmatic interest in controlling the environment within the facility to minimize distractions and maximize the chances of obtaining and retaining more stable housing.

[19] We need not address a set of issues that the parties dispute regarding the significance of the fact that one or more provisions in the contract might violate Wisconsin statutes, including but not limited to those in WIS. STAT. ch. 704. Neither side presents a developed argument that it could matter here that any contract provision violates a statute.

(continued)

¶39    Fourth, program participation was transitory in nature, lasting only until the day on which Williams decided to move out (either to more stable housing, or for any other reason) or on which the program notified her of, in the words of the contract, "program termination."  Neither the fact that there were monthly program fees nor the fact that program materials indicated that participants might be able to remain for up to two years changed the essentially day-to-day nature of the relationship described in the contract.  At least two nexuses from this transitory nature to the purpose of the program are evident.  One nexus is that, if program staff were not able to promptly remove participants who did not comply with the restrictive program rules, then noncompliant participants might persist in behavior that was distracting to other program participants (*e.g.*, not observing the rule against alcohol consumption or the curfew-type provision).  The other nexus is that, if participants could not be promptly removed, they would have less incentive to avoid behavior that could distract themselves from reaching the programming's goals.

¶40    For these reasons, we conclude that the contract expresses a primary and dominant purpose that the parties undertake a mutual effort, in a highly controlled environment, to help Williams find more stable housing in the future.

---

While on the topic of additional authority, Williams makes passing references to the manner in which the U.S. Department of Housing and Urban Development purportedly defines certain categories of social services related to housing.  But she fails to develop an argument that could tie federal regulation to any pertinent issue in this appeal.  Further, after the Society asserts that such rules could have no bearing here because the Society does not take public funding, Williams concedes at least this particular point through silence in her reply brief.  *See United Co-op. v. Frontier FS Co-op.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (appellant's failure to respond in reply brief to an argument made in respondent's brief may be taken as a concession).

2.    *Application To The Undisputed Evidence Regarding Surrounding Circumstances*

¶41    The undisputed evidence outside the four corners of the contract reveals that the program-oriented, as opposed to temporary-housing-oriented, statements and requirements in the contract that we have just referenced were not illusory or in-name-only.  The evidence summarized above reflects that Williams was in fact required to work with the program director to, in the words of the required-participation provision, "establish individualized goals for securing permanent housing and related issues," including routinely accounting for all of her income and expenses.

¶42    Williams does not seriously contest the point.  Her counsel asserted at oral argument that "the services were provided in these short bursts," and that they were available "only in these 15 minute chunks."  But Williams fails to support this position and our summary of the undisputed evidence shows the contrary.  It is true that Williams averred that the weekly meetings with one program director lasted "approximately 30-60 minutes" and then, after a new program director replaced the first, the weekly meetings lasted "approximately 15-20 minutes."  However, even considering these particular averments in the light most favorable to Williams, they do not raise a genuine issue about the nature of the services provided.  Further, counsel acknowledged at oral argument that, regardless of the degree to which Williams personally availed herself of services while she resided in the facility, the contract contemplated the potential for extensive, daily educational and counseling interactions between program staff and program participants.

¶43    Williams acknowledges that it is undisputed that the program was marketed as a transitional housing program (not as an apartment building) and that

it provided not only temporary housing to program participants but also case management services. Indeed, her attorney conceded at oral argument that the services made available to Williams were of the type that "are certainly vital to obtaining permanent housing."

¶44 In sum, we conclude that the undisputed related evidence in the record matches what we have explained above is the substance of the contract, creating a legal relationship with the primary and dominant purpose of making available to Williams educational, counseling, and similar services with the aim of helping her obtain more stable housing in the future. Williams's temporary occupation of the unit was only incidental to that purpose. We next address the specific arguments Williams makes to the contrary.

### D. Williams's Arguments

¶45 At times, Williams in effect asks us to merge two distinct purposes into a single topic: (1) the temporary shelter for Williams and her children provided by the Society in its facility and (2) the counseling and other tools that the program provided to give Williams a better chance of obtaining and retaining more stable housing in the future. Both purposes involved the generic topic of "housing." This creates superficial appeal in the idea that the legal relationship involved a single topic: housing for Williams. No doubt the relationship at issue here involved a blend of temporary housing and social services. But we agree with the Society that the evidence reveals that the primary and dominant purpose of the relationship was to help Williams find and hold onto longer term housing, which was a purpose distinct from and in addition to the incidental purpose of providing her with temporary shelter while she received that assistance.

26

¶46    On a related note, Williams contends that all of the educational, counseling, and similar services made available to her depended in one way or another on her having a temporary place to live, and therefore the temporary shelter by definition could not be incidental to the legal relationship.  At oral argument, counsel for Williams emphasized this position, contending that, without temporary housing, program participants could not receive supplies and would lack the mailing address necessary to apply for more stable housing.  Accepting for the sake of argument the premise that temporary housing was indispensable to the goal of obtaining housing with some stability, we reject this "but for" argument on the ground that it is limitless and ignores the reasoning in *M & I*. Followed to its logical conclusion, this argument amounts to a contention that the legislature must intend that any and all contracts that involve the provision of temporary shelter must be subject to WIS. STAT. ch. 704 because having shelter is essential to people being able to accomplish virtually any purpose.

¶47    Having made those broad points, we turn to what may be Williams's core argument, and explain why we conclude that it rests on only a few relevant facts and in effect ignores many other facts relevant to the *M & I* test.  Williams's argument starts with the observation that "rental agreement" is defined by statute in part by stating that a landlord and tenant "agree on the essential terms of the tenancy, such as rent."  *See* WIS. STAT. § 704.01(3m).[20]  Williams points out that

---

[20]  WISCONSIN STAT. § 704.01(3m) provides in its entirety:

> "Rental agreement" means an oral or written agreement between a landlord and tenant, for the rental or lease of a specific dwelling unit or premises, in which the landlord and tenant agree on the essential terms of the tenancy, such as rent. "Rental agreement" includes a lease.  "Rental agreement" does not

(continued)

27

"rent" is not a defined term in WIS. STAT. ch. 704, but that one legal dictionary definition is "'[c]onsideration paid for use or occupation of property.'" *See M & I*, 195 Wis. 2d at 501 (quoted source omitted). Here, Williams notes, she committed in the contract to pay a monthly $425 program fee and she could be terminated from the program and forced to vacate her assigned unit if she failed to pay these fees. Using these concepts as building blocks, Williams asserts that any time a person pays "consideration" to occupy property, the "consideration" is by definition "rent" under § 704.01(3m) and, further, that this establishes the existence of a landlord-tenant relationship, regardless of the surrounding circumstances. In a variation on this theme, Williams argues that the program fee she committed to pay was "clearly paramount" to the legal relationship because the Society was entitled to terminate her from the program based on nonpayment. She also contends that the undisputed fact that her program fees were used to help defray the cost of case management, as opposed to primarily covering property maintenance and overhead costs as a landlord ordinarily would, "has no legal bearing on its definition as rent."

¶48 If Williams were correct about the effect of the existence of program fees, the *M & I* opinion would have been considerably shorter. Having established that the residents paid money as part of a contract permitting them to occupy property, the court would have concluded based on that fact alone that there was a rental agreement. No doubt it is relevant to the analysis here that, under the contract, Williams was obligated to pay a fixed sum on a monthly basis

include an agreement to enter into a rental agreement in the future.

and that she could lose her assigned unit upon failure to pay. However, Williams misses the mark in suggesting that these facts are dispositive. Indeed, as the Society suggests, her approach has no stopping point and would lead to such absurd results as deeming a person who reserves a hotel room under ordinary circumstances a "tenant" of the "landlord" hotel, entitled to all the protections of WIS. STAT. ch. 704. More specific to this case, Williams omits much undisputed, relevant evidence, which we have detailed, about the nature of the contract and details of the program as operated that support our conclusion. For example, the program fees feature of the contract did not elevate payment of the fees above the other provisions in the contract that entitled the Society to terminate her, notably including "if she fails to actively work on her goals as outlined in her case plan."

¶49 Williams argues that we should count the total number of paragraphs in the contract that address topics that are generally, or at least could be, included in a rental agreement and compare that to the single required-participation provision in the contract. The first problem with this argument is that many of the provisions, even apart from the required-participation provision, contain features that provide strong clues to the primary and dominant purpose of the legal relationship, including but not limited to the "goal" stated at the outset that the program would "provide women and children temporary shelter and case management to help families move from homelessness to permanent housing," and the "[n]o male guests" and "abstain from alcohol" rules. Second, even putting that point to the side, as we have summarized it above, the *M & I* analysis calls for a holistic analysis of the contract and the circumstances, not merely tallying how many provisions in a contract address what types of issues.

¶50 Although not developed as an argument in her briefing, Williams suggested at oral argument that the contract gave her "exclusive possession" of her

assigned unit and that this should count heavily in favor of rental agreement status. *See* WIS. STAT. § 704.05(2) (referring to "tenants" generally having "the right to exclusive possession of the premises"). The Society argues that her possession of the unit was not "exclusive," because the contract placed so many restrictions on her activities, such as the prohibition on male visitors and an effective curfew. Without attempting to apply a definition to the term "exclusive possession" in this context, we agree with Williams that it counts in her favor that she was given a key and "assigned" occupancy of a particular two-bedroom unit with its own bathroom, kitchen, and living room, and had the apparent freedom to exclude persons other than program staff. *See* RESTATEMENT (SECOND) OF PROPERTY, LANDLORD AND TENANT § 1.2 cmt. a & Reporter's Note, 1. (AM. L. INST. 1977) (exclusive possession and control of premises is relevant to distinguishing tenants from mere licensees). This was not a communal living arrangement, nor was the relationship similar to that of a hotel to a guest or of a hospital to an inpatient. However, this greater possessory interest is not dispositive in favor of Williams, given the other factors we have summarized, under the holistic *M & I* analysis that calls for a determination of a primary and dominant purpose.

¶51 Williams suggests that the required-participation provision is too "generic" to carry weight. We disagree. It is true that this provision does not attempt to detail all of the educational, counseling, and similar services available to Williams as part of the program. However, when read in context with other features of the contract that we have discussed it contributes strongly to a conclusion that the parties did not enter into a rental agreement.

¶52 Williams emphasizes that the Society lists as "[b]asic eligibility requirements" for potential participants in the program not only "[h]ousing instability/homelessness" and a "[d]esire and intent to participate in case-

management activities," but also "[p]hysical and mental health sufficient to live independently" and a "[d]ocumented, steady source of income." Her suggestion may be that anyone with an ability to "live independently," and who has a "steady source of income," could not have a significant need for education, counseling, and other services aimed at helping her obtain and retain more stable housing in the future. If this is the intended suggestion it has no merit as a legal argument. "Live independently" in ordinary parlance means that one does not have a disability that interferes with the ability to accomplish the basic tasks of daily living such as personal grooming or feeding oneself; a "steady source of income" could include minimal government assistance payments or part-time, low-paying employment.

¶53 Two related arguments that Williams makes, purportedly based on statutory language, are undeveloped. First, Williams suggests that, even if we were to conclude that the Society was exempt from the operation of WIS. ADMIN. CODE ch. ATCP 134 under the terms of WIS. ADMIN. CODE § ATCP 134.01(1) because Williams's occupancy was "incidental to … the provision of … educational, counseling, … or similar services," we should still apply WIS. STAT. ch. 704 because the legislature has directed that "the department of agriculture, trade and consumer protection may not issue an order or promulgate a rule under [WIS. STAT. §] 100.20 that changes any right or duty arising under this chapter." *See* WIS. STAT. § 704.95. But § 704.95 could apply here only if Williams had an argument that § ATCP 134.01(1) "changes" a "right or duty" established in ch. 704, and this she fails to do. Second, at oral argument, counsel for Williams made reference to the passage of 2011 Wis. Act 143, "relating to[ ] miscellaneous landlord-tenant provisions and prohibiting a local government from imposing a moratorium on eviction actions," which changed aspects of ch. 704, including the

creation of the § 704.95 language that Williams now purports to rely on. *See* 2011 Wis. Act 143. However, neither in her briefing nor at oral argument has Williams clearly explained how any aspect of statutory changes in 2011 Wis. Act 143 would affect the pertinent analysis in this case.

¶54 Finally, both Williams and the Society make policy arguments that would have to be directed to our legislature. For example, Williams essentially argues that the Society must be required to assume the legal responsibilities of a landlord in connection with its transitional housing program, because otherwise it sets program participants on a path to eventually become tenants who are unaware of their rights and obligations. On a related note, she suggests that, without landlord-tenant law to protect them, program participants vulnerable due to housing instability are subject to "unfair or arbitrary action," and more specifically that here the Society mistreated Williams because she was given short notice to vacate and she was not provided with "vital" access to judicial process at the time she was removed from the unit. Both Williams and the Society refer to practices of other programs or agencies in Dane County that make available simultaneous temporary housing and case management, attempting to suggest what is feasible or proper in this context by comparison to allegedly common practices. Further, the Society argues that it "would be adversely affected or even [required to] shut down," ending its "role in fighting chronic poverty and homelessness," if it were required to meet the legal obligations of a landlord. In effect, all of these arguments ask us to override the policy choices of our legislature, either out of sympathy for individuals in the shoes of Williams or for the housing-instable women and their dependent children who benefit from the Society's program. It would be for the legislature to weigh the merits of possible changes or

clarifications regarding how the landlord-tenant relationship is defined in Wisconsin.

## CONCLUSION

¶55　For all these reasons, we affirm the circuit court's summary judgment decisions.

*By the Court*.—Order affirmed.